**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:15-cv-303-FDW**
**(3:12-cr-30-FDW-1)**

| | |
|---|---|
| **FREDDIE ANDAYA,** )<br>)<br>      **Petitioner,** )<br>)<br>**vs.** )<br>)<br>**UNITED STATES OF AMERICA,** )<br>)<br>      **Respondent.** )<br>_____) | **ORDER** |

    **THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1). Also pending before the Court are the following motions filed by Petitioner: (1) Motion to Appoint Counsel, (Doc. No. 8); (2) Motion for Petitions, (Doc. No. 12); and Motion to Appoint Counsel, Motion to Amend/Correct Motion to Vacate, Set Aside, Correct Sentence, (Doc. No. 13).

    **I.    BACKGROUND**

    1. Petitioner's offense conduct.

    Between 2010 and 2011, Petitioner Freddie Andaya operated a large-scale, drug-trafficking conspiracy, responsible for distributing hundreds of kilograms of cocaine in several North Carolina counties. (Crim. Case No. 3:12-cr-30-FDW-1, Doc. No. 40 at ¶¶ 5; 21; 22: PSR). Authorities began investigating Petitioner in May 2011, when a confidential informant revealed to law-enforcement officers that Petitioner had asked the informant to install a compartment in a Volkswagen Jetta to conceal a large amount of cocaine. (Id. at ¶ 6). After the compartment was installed, law-enforcement officers conducted surveillance on the automobile and followed it to

1

1440 Concord Farm Road and to 2293 Concord Farm Road, both in Concord, North Carolina. (Id.; Doc. No. 35-1 at 2: Ex. 1). Officers later seized 364 grams of cocaine that was thrown out of a car by Christopher Coleman, subsequently identified as one of Petitioner's co-conspirators, after Coleman left the 2293 Concord Farm Road residence. (Id., Doc. No. 40 at ¶ 7; Doc. No. 35-1 at 2-3).

This seizure prompted officers to return to both residences and, seeing the Jetta at 1440 Concord Farm Road, the officers asked for consent to search that home from its occupant, Bautista Andaya, Petitioner's cousin. (Id., Doc. No. 40 at ¶ 8; Doc. No. 35-1 at 3: Ex. 1). Bautista Andaya signed a consent-to-search form, and officers conducting the search found 3.5 kilograms of cocaine, $342,000 in cash, an assault rifle, and four ledgers detailing the trafficking of approximately 300 kilograms of cocaine in exchange for at least $9 million between April and July 2011. (Id., Doc. No. 35-1 at 2-4; Doc. No. 40 at ¶ 8). Upon his arrest, Bautista Andaya reported to officers that the 1440 Concord Farm Road residence was used as a drug "stash house" and was operated by Petitioner. (Id., Doc. No. 40 at ¶ 8).

Based on these ledgers and subsequent interviews, officers learned that Petitioner conducted numerous drug transactions at an auto-repair shop operated by Freddie Delgado-Mercado. (Id. at ¶¶ 5; 10; 15). Officers also learned that Delgado-Mercado assisted Petitioner in recruiting drug buyers for the conspiracy. (Id. at ¶ 15). One of those buyers was Levaric Johniken, who reported to authorities that he bought more than six-and-one-half kilograms of cocaine from Petitioner over the course of a year. (Id. at ¶¶ 9-10). Johniken arranged to broker a one-kilogram transaction between Petitioner and two other individuals in August 2011 and, based on a consensually monitored phone call between Johniken and Petitioner, authorities

identified a trailer located at 642 Wyoming Drive in Concord as another of Petitioner's stash houses. (Id. at ¶ 11).

After conducting a knock-and-talk at the trailer on August 15, 2011, officers obtained a search warrant for the property and later executed the warrant, seizing $24,000 in cash and a .38 caliber revolver. (Id., Doc. 25-2 at 13: Ex. 2; Doc. No. 40 at ¶ 11). Petitioner, who was present when the search was conducted, was arrested following the search and admitted that he distributed cocaine to Johniken and others. (Id., Doc No. 40 at ¶ 11). Petitioner also acknowledged that the cocaine that had been seized at 1440 Concord Farms Road had originated from a drug source in Georgia. (Id.). Investigators estimate that Petitioner was responsible for the distribution of at least 300 kilograms of cocaine based on the ledgers found at the Concord Farm Road stash house. (Id. at ¶ 21). Following his arrest, Petitioner threatened Delgado-Mercado and created a false affidavit purporting to come from Delgado-Mercado and refuting any involvement by Petitioner in the conspiracy. (Id. at ¶¶ 22; 24).

2. Petitioner pleads guilty and affirms that he has reviewed the parties' plea agreement and that his plea is knowingly and voluntarily entered.

A federal grand jury indicted Petitioner and charged him with conspiracy to distribute and possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); participation in a money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and possession of a firearm in furtherance of a drug-trafficking offense and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2. (Crim. Case No. 3:12cr30-FDW, Doc. No. 1 at 1-3: Indictment). Three weeks after Petitioner was indicted, the Government filed a notice in accordance with 21 U.S.C. § 851 that it would seek an enhanced

penalty based on Petitioner's prior federal conviction for conspiracy to possess with intent to distribute cocaine.  (Id., Doc. No. 8: Information Pursuant to 21 U.S.C. § 851).

Just over two months after he was indicted, Petitioner entered into a plea agreement with the Government, in which he agreed to plead guilty to all three charges against him.  (Id., Doc. No. 10: Plea Agreement).   In the parties' agreement, Petitioner acknowledged that he was, in fact, guilty of the charged offenses, and that he faced a statutory mandatory minimum of 20 years in prison based on the Government's § 851 notice.  (Id. at ¶¶ 1; 3).  Petitioner stipulated that the prior conviction referenced in that notice was a valid predicate felony drug offense.  (Id.).  In the same paragraph of the plea agreement, the Government agreed to withdraw the § 851 notice, reducing the applicable statutory mandatory minimum to ten years in prison, as long as Petitioner complied with every provision of the parties' agreement, including his agreement to cooperate with the Government.  (Id.).  The parties stipulated in the agreement that at least 150 kilograms of cocaine was reasonably foreseeable by Petitioner during the course of his participation in the charged conspiracy, and the Government agreed not to oppose a sentence at the bottom end of the range of imprisonment advised by the United States Sentencing Guidelines.  (Id. at ¶¶ 6(a); 6(d)).  Both Petitioner and his trial counsel, Charles Morgan, signed the plea agreement on March 14, 2012.  (Id. at 8).

Eight days after Petitioner signed the plea agreement, this Court, Magistrate Judge David S. Cayer, presiding, conducted a hearing and colloquy in accordance with Federal Rule of Criminal Procedure 11.  (Id., Doc. No. 29: Plea Hearing Tr.).  During the hearing, Petitioner affirmed that he understood that he was under oath and that if he gave false information, he could be prosecuted for perjury.  (Id. at 2).  Petitioner also affirmed that he understood the charges to which he was pleading guilty, as well as the maximum penalties he faced, including the fact that,

without the plea agreement, he faced a statutory mandatory minimum of 20 years as to the drug-trafficking offense.  (<u>Id.</u> at 3-4).  Petitioner affirmed that he understood that the applicable Sentencing Guidelines range of imprisonment would not be determined until after a Presentence Report was prepared and that if the sentence imposed was more severe than he expected, he would still be bound by his guilty plea and would "have no right to withdraw it."  (<u>Id.</u> at 5).  After acknowledging the charges and potential penalties, Petitioner affirmed that he was, in fact, guilty of all three offenses to which he was pleading guilty.  (<u>Id.</u> at 7).

Government counsel then reviewed the terms of the parties' agreement, with counsel noting that Petitioner's failure to comply with any provision of the agreement or his attempt to withdraw the guilty plea would relieve the Government of its obligations under the parties' agreement.  (<u>Id.</u> at 8).  Government counsel noted further that Petitioner acknowledged in the parties' agreement that "the law provides certain limited rights to withdraw a plea of guilty"; that Petitioner had discussed those rights with his counsel; and that Petitioner "knowingly and expressly waive[d] any right to withdraw the plea" once it was accepted.  (<u>Id.</u> at 9).  When asked whether he understood those to be the terms of his plea agreement, Petitioner replied, "Yes."  (<u>Id.</u> at 10).  Petitioner also responded affirmatively when asked whether he had received enough time to discuss with his attorney any possible defenses to the charges against him and whether he was "satisfied with the services of [his] attorney in this case."  (<u>Id.</u> at 11).  Responding to the magistrate judge's question as to whether he had heard and understood "all parts" of the hearing and still wished to plead guilty, Petitioner stated, "Yes, I'm guilty."  (<u>Id.</u> at 12).  Finally, the magistrate judge asked Petitioner's attorney, Morgan, whether he had reviewed the terms of the plea agreement with Petitioner and was satisfied that Petitioner understood those terms.  (<u>Id.</u>).  Morgan responded that both he and David Demers, a contract lawyer in his office, had reviewed

the agreement with Petitioner and both were satisfied that he understood its terms. (Id.). The magistrate judge then accepted Petitioner's plea of guilty after finding it to have been "knowingly and voluntarily made." (Id.).

3. Notwithstanding his sworn statements that he was guilty and understood the charges and potential penalties he faced, Petitioner moves to withdraw his guilty plea.

Five months after he entered his guilty plea, Petitioner requested a hearing to inquire into the status of counsel. (Id., Doc. No. 15: Motion for Inquiry of Counsel). A little over a month later, on October 3, 2012, Petitioner filed a pro se motion seeking to withdraw his guilty plea, asserting that his Fourth Amendment rights had been violated and that Morgan had refused to give him copies of his discovery and other court documents. (Id., Doc. No. 17: Motion Rejecting Plea Agreement). The next day, this Court conducted an inquiry into the status of Petitioner's relationship with Morgan. (Id., Doc. No. 54 at 1; 3: Motion Hearing Tr.). During that hearing, after Government counsel noted that Petitioner appeared to misunderstand his sentence exposure in light of the Government's agreement to withdraw the § 851 notice, Morgan stated that "[t]hat's what [he and Petitioner had] discussed"—"what would happen if [Petitioner] was convicted at trial versus what his benefit would be in a plea." (Id. at 5-6). Morgan then joined Petitioner in requesting that he be permitted to withdraw as Petitioner's counsel, explaining that their differences had escalated and that he feared that "by responding to the charges [he would] prejudice [Petitioner]." (Id. at 7). Morgan noted that during his first meeting with Petitioner, Petitioner had stated that he wanted to file a lawsuit against the Concord Police Department based on allegations of police brutality and needed a copy of his discovery in connection with that lawsuit. (Id. at 8-9). Morgan explained that he declined to provide Petitioner a copy of the discovery in accordance with his agreement with the Government, which required Morgan to

refrain from giving copies of discovery to his client.  (Id.).  Morgan made clear that he had reviewed discovery with Petitioner, stating that Petitioner "believe[d] there [was] other discovery that [they had not] shown him even though [they had] sat down several times . . . to show him everything [they had that was] relevant to his involvement."  (Id. at 9).

When this Court asked Petitioner why he wanted a new attorney, Petitioner responded that Morgan "only came three times" and that his assistant had come on one of those occasions. (Id. at 11).  Morgan responded by explaining that he and Demers collectively had made a total of 12 visits, with Morgan making half of those visits.  (Id. at 14).  Morgan explained that Demers was a young lawyer who worked with him and who was on the "training panel" and working to qualify for the "regular panel."  (Id.).

When this Court asked Petitioner why he wanted to withdraw his plea, Petitioner responded, "Because they came in the house without permission."  (Id. at 12).  Government counsel and Morgan then explained that two searches had been conducted during the investigation—a consent search based on Bautista Andaya's consent given while Petitioner was not present and another search pursuant to a search warrant.  (Id. at 12-14).  Following this discussion, this Court granted Morgan's motion to withdraw as Petitioner's counsel.  (Id. at 19).

Four months after the status-of-counsel hearing and nine months after he pleaded guilty, Petitioner filed, through new counsel, a motion to withdraw his plea.  (Id., Doc. No. 24: Motion to Withdraw Plea of Guilty).  In the motion, Petitioner asserted that Morgan did not "fully advise him of the consequences, ramifications and potential sentence" that he would be exposed to in signing the plea agreement and, more specifically, that an investigator working with Morgan advised him that he "could probably get a probationary sentence with regard to [the] plea agreement."  (Id. at ¶¶ 5-6).  Petitioner also asserted that "he was not able to see all of the

discovery in [the] case and therefore [was] not able to make an intelligent decision with regard to entering into the plea." (Id. at ¶ 7).

The Government filed a response to Petitioner's motion, noting that nowhere in his motion did Petitioner assert that he was innocent of the offenses to which he pleaded guilty. (Id., Doc. No. 25 at 6: Response). Government counsel also noted that Petitioner had provided law enforcement with "an unusually detailed description of his criminal conduct," which was contained in a 17-page interview report. (Id.). Government counsel asserted that Petitioner's claim that he had been advised that he could get a probationary sentence was incredible, given the mandatory-minimum penalties that Petitioner acknowledged he faced. (Id.). Government counsel attached to its response a record of the Rule 11 colloquy, as well as the lengthy account of Petitioner's interview with law enforcement. (Id., Doc. Nos. 25-1, 25-2: Exs. 1 & 2). In that interview, Petitioner acknowledged that he had previously served 96 months in prison following his prior federal drug-trafficking conviction. (Id., Doc. No. 25-2 at 1).

4. Following an evidentiary hearing and a second hearing for the purpose of argument, this Court denies Petitioner's motion to withdraw his plea, finding, in part, that Petitioner's testimony that he was not informed of its consequences was not credible.

This Court first conducted an evidentiary hearing on Petitioner's motion to withdraw his guilty plea. (Id., Doc. No. 30: Hearing Tr.). During the hearing, Petitioner testified that he did not have any discussions with Morgan about entering a guilty plea and that he had met with Demers three times. (Id. at 5; 13). Petitioner testified that he was shown only the last page of his plea agreement, which was the page containing his signature. (Id. at 6). According to Petitioner, he was not told which offenses he was pleading guilty to; he was told, instead, "to plead guilty and that [he] would get probation." (Id. at 6; 7). Petitioner testified that he never

received a copy of the plea agreement that was translated into Spanish, nor did Morgan or

Demers bring an interpreter to meet with him or attempt to review the agreement in Spanish. (<u>Id.</u>

at 7).

When the Court asked Petitioner whether he would have signed the plea agreement had

he been advised that he was "looking at a mandatory 15 years in prison," Petitioner responded,

"No." (<u>Id.</u> at 8). Petitioner testified that he did understand when he pleaded guilty that he was

entering a guilty plea; he testified that neither Morgan nor Demers had reviewed the questions he

would be asked by the magistrate judge; and he acknowledged that he was provided an

interpreter for the hearing but nevertheless asserted that he did not understand all of the questions

asked of him. (<u>Id.</u> at 9; 10). When asked specifically why he did not respond, when asked

whether any promises were made to him, that his attorney had promised him probation,

Petitioner responded that he "[did not] remember." (<u>Id.</u> at 12).

When the Court asked why wanted to have his guilty plea set aside, Petitioner answered,

"[b]ecause they went into my house without any right." (<u>Id.</u> at 14). Petitioner testified that the

police officers had a search warrant for another house, not his house, and that they "[were] lying

in their reports." (<u>Id.</u>). Petitioner concluded that he was "duped by [his] attorney" in that his

attorney "never had time to check on my case and to see the possibility of [his] getting out

because they did everything illegally." (<u>Id.</u>).

During cross-examination by Government counsel, Petitioner acknowledged that he had

seen the 17-page report of his interview with law enforcement, but he denied that he had been

involved in the charged drug conspiracy, stating, "I drove for somebody but I have never done

drug deals." (<u>Id.</u> at 15-17). Petitioner also acknowledged that he saw a small device on the table

during his interview but did not know what it was, as no one told him that the conversation was

going to be recorded.  (Id. at 16).  Petitioner testified that, notwithstanding the law-enforcement officers' report, he had never told them that he had knowingly transported cocaine.  (Id. at 17). When asked why he pleaded guilty to a drug charge when he did not commit drug trafficking, Petitioner responded, "I didn't plead guilty because I was guilty, I pled guilty because I was going to get probation and I wanted to go home."  (Id. at 17-18; 27-28).  Petitioner acknowledged that, during his plea hearing, Government counsel had specifically stated that he was facing a mandatory minimum of ten years for the drug charge and a consecutive five years for the gun charge.  (Id. at 19).

Petitioner also acknowledged that he was shown the entire plea agreement during the hearing and that he confirmed at that time that it was his signature on the last page of the agreement.  (Id. at 20).  Addressing his assertion that his Fourth Amendment rights were violated by an illegal search, Petitioner testified on cross-examination that, while his name was on the lease for the house at 1440 Concord Farm Road, his cousin, Bautista Andaya, actually lived there.  (Id. at 20-21).  Although Petitioner insisted that his cousin had not actually consented to the search and that the law enforcement officers "broke the door to get in," he also acknowledged that he did not "really know what happened that day."  (Id. at 21).

Government counsel then asked Petitioner more specifically about jail visits from Morgan and Demers, and Petitioner acknowledged that he met with Morgan when he was appointed, giving Morgan a copy of his lawsuit against the Concord Police Department, as well as on another occasion to review the indictment.  (Id. at 25-26).  Petitioner also acknowledged that Morgan visited him on another occasion a week or so later when Petitioner asked Morgan to retrieve a watch and a bracelet from the Concord jail.  (Id. at 26).  When Government counsel asked Petitioner whether Morgan also came to see him on March 7, 2012, when he "went over

the 54 disks of information with [Petitioner], or at least a portion," Petitioner responded that it was Demers who had visited him. (Id.). Government counsel then asked Petitioner about March 13 and 14 and whether his lawyer had come to review the plea agreement with him on March 13 and again on March 14, when Petitioner signed the agreement. (Id. at 26-27). Petitioner acknowledged that Demers had come but testified that he did not remember whether Demers had spoken to him two days in a row about the plea agreement. (Id.).

Following Petitioner's cross-examination, this Court questioned him, noting that he had either lied during his testimony or he lied in response to the magistrate judge's questions during his Rule 11 hearing, in response to which Petitioner stated, "Yes" but insisted that he was not lying "right [then]." (Id. at 29). In response to this Court's questions, Petitioner acknowledged that the magistrate judge "never mentioned the word 'probation,'" and that the magistrate judge advised him of the statutory maximum sentence he could receive for each count. (Id. at 30-31). This Court then addressed the implications of Petitioner's attempt to withdraw his guilty plea, during which Petitioner acknowledged that if he were permitted to withdraw his plea, he could lose his three points for acceptance of responsibility and that if he obstructed justice during the course of his sentencing process, he could also receive a two-level increase for obstruction. (Id. at 31-32). At the conclusion of this colloquy, Petitioner's counsel reported to this Court that he had advised Petitioner that, as a result of his decision to seek the withdrawal of his guilty plea, the Government would not withdraw its § 851 notice and his mandatory minimum would be 20 years, plus a consecutive five years for the § 924(c) firearm offense. (Id. at 33-34).

Following more argument from both sides, this Court requested that the Government submit affidavits from both Morgan and Demers, as well as from investigators concerning the circumstances of the search about which Petitioner had complained. (Id. at 44-45). The

Government subsequently filed affidavits from Demers and Special Agent David Ramsey, one of the task-force officers who investigated the conspiracy. (Id., Doc. No. 34-1: Ex. 1; Doc. No. 35-1: Ex. 1).

In his affidavit, Demers stated that he worked as a contract attorney for Morgan and under his direct supervision. (Id., Doc. No. 34-1 at ¶ 1). Demers stated that Petitioner was informed from the beginning of Morgan's representation that Morgan was his primary attorney and that Demers was merely assisting Morgan. (Id.). Responding specifically to Petitioner's claim that Demers promised him a probationary sentence, Demers stated that he did not promise Petitioner, "nor would [he] promise any client, a probationary sentence, under any circumstances." (Id. at ¶ 2). With respect to Petitioner's assertion that he was never advised of the evidence against him and that he never saw the plea agreement, except its last page, before signing it, Demers stated that his and Morgan's practice was to review discovery, guideline calculations, and plea-agreement terms with the client before obtaining the client's signature and that "[a]ll of these bases were covered" with Petitioner. (Id. at ¶ 3). Demers stated more specifically that visits with Petitioner were made on three occasions in the week before he signed the plea agreement for the purpose of reviewing discovery with him, as well as the proposed plea agreement. (Id.). Demers then referenced an e-mail he sent to Morgan the day after the plea agreement was signed, in which Demers summarized for Morgan the fact that he had played the audio discovery for Petitioner and Petitioner acknowledged his presence at a one-kilogram transaction. (Id.).

Demers also reported to Morgan in that e-mail that he had discussed the benefits of cooperation, including the possibility of a downward departure under Sentencing Guidelines §

5K1.1, and that Petitioner "agreed that cooperating was the best way to get his sentence below the guidelines for 150+ kilos." (Id.).  Demers attached this e-mail to his affidavit.  (Id. at 3).

In his affidavit, Task Force Officer Ramsey summarized the investigation against Petitioner and the eventual interest in the home located at 1440 Concord Farms Road.  (Id., Doc. No. 35-1 at ¶¶ 3-7: Ex. 1).  Officer Ramsey described the events that led to the search of the home, explaining that Bautista Andaya gave both verbal and written consent to the search that yielded more than $340,000 in cash and drug ledgers.  (Id. at ¶¶ 8-9).  This Court then conducted a second hearing on Petitioner's motion to withdraw his guilty plea, during which Petitioner stated that his attorney failed adequately to investigate "irregularities" in his case and that he could prove that he was innocent of the charges against him.  (Id., Doc. No. 59 at 7: Motion Hearing Tr.).  This Court then asked Petitioner to present any evidence that he had of his innocence, in response to which Petitioner presented a page from one of his co-defendant's Presentence Report, in which the probation officer stated that an AK-47 was recovered from the 1440 Concord Farms Road residence, rather than an AR-15.  (Id. at 8; 10-11).  In response, Government counsel submitted the inventory from the search that reflected that it was an AR-15 that was seized from the home.  (Id. at 12).  Petitioner then submitted documentation referring to searches that occurred five and seven days after the searches that had earlier been discussed, in response to which Government counsel explained that officers went back to one of the homes five days after their initial search and searched a cell phone two days after that.  (Id. at 16-18; 20-22).  Considering this evidence, this Court found that an AR-15 was seized during the search of 1440 Concord Farm Road, rather than an AK-47 as reflected in the excerpt from the co-defendant's Presentence Report.  (Id. at 23).  This Court also noted that it appeared that the search of that home was lawful and that the Government had explained the different dates that

Petitioner found incriminating. (Id. at 24). This Court then addressed the factors applicable to a defendant's motion to withdraw a guilty plea under United States v. Moore, 931 F.2d 245, 248 (4th Cir. 1991), finding, first, that Petitioner had "not provided any credible evidence that his plea was not knowing or voluntary." (Id. at 35-36).

This Court found that the Rule 11 colloquy that had been conducted was "totally appropriate." (Id. at 36-37). This Court next found that Petitioner had not credibly asserted his legal innocence of the charges to which he had pleaded guilty. (Id. at 25). This Court noted that Demers categorically denied that he had promised Petitioner a probationary sentence, and Petitioner acknowledged that the magistrate judge had informed him of the maximum penalty he faced if he pleaded guilty. (Id. at 26). In finding that Petitioner had been properly informed of his right to plead not guilty and of the maximum punishment he faced, this Court noted, in addition to Demers's affidavit attesting that he did not so advise Petitioner, that Petitioner had earlier served a sentence as a result of a federal conviction, that the Rule 11 inquiry was translated into Spanish and was "totally appropriate," and that it was "just totally illogical that the defendant would have been promised a probationary sentence." (Id. at 30; 35-36). This Court also found it highly improbable that Petitioner would have stayed silent during the Rule 11 hearing if he believed he would receive a sentence of probation, while the magistrate judge advised him of mandatory-minimum terms of imprisonment. (Id. at 30-31). This Court concluded, by a preponderance of the evidence, that Petitioner was not promised a probationary sentence, that his plea was knowing and voluntary, and that he had not made a credible assertion of innocence. (Id. at 31; 35-36).

Addressing the remaining factors, this Court found the six-month delay between the entry of the plea and Petitioner's request to withdraw his plea to be neutral. (Id. at 32; 36). Noting

that Demers showed that there were multiple jail visits, that he played the audio discovery for Petitioner, that Petitioner acknowledged that he was present for a one-kilogram deal, and that Demers never promised Petitioner a probationary sentence, this Court found that Petitioner had the assistance of competent counsel and that this factor weighed against permitting the plea withdrawal.  (Id. at 36-37).  With respect to prejudice to the Government, this Court asked Government counsel if the delay would make it difficult to "put the case back together," in response to which Government counsel noted that a number of Petitioner's co-defendants had already been sentenced and had already benefited from downward departures such that it was unclear "who would still be cooperative."  (Id. at 32-33).  When Government counsel acknowledged that he could not answer that question fully, this Court concluded that this factor was neutral, as well.  (Id.).  Noting that it was this Court's job to provide defendants their right to the courtroom, this Court next found the factor that considered the inconvenience to the court or the waste of judicial resources also to be neutral.  (Id.).  Concluding that the first, second, and fourth factors weighed in favor of denying the motion to withdraw the plea, while the other factors were neutral, this Court found that Petitioner had not shown a fair and just reason to withdraw the plea and denied his motion.  (Id. at 37).  In explaining its ruling, this Court noted that Petitioner "certainly [hadn't] shown that he is legally innocent."  (Id.).

     5. This Court sentences Petitioner to life in prison.

     In preparation for Petitioner's sentencing hearing, the probation office submitted a Presentence Report ("PSR") in which the probation officer calculated an adjusted offense level of 46, which level was reduced to a level 43, the highest possible offense level under the United States Sentencing Guidelines.  (Id., Doc. No. 40 at ¶¶ 33; 36).  A total offense level of 43 and a criminal history category of I yielded an advisory Sentencing Guidelines term of life in prison as

to the drug-trafficking and money-laundering offenses, limited to a statutory maximum of 20 years as to the money-laundering offense. (Id. at ¶¶ 55; 56). The probation officer noted that Petitioner faced a statutory mandatory minimum term of 60 months as to the § 924(c) firearm offense, to run consecutively. (Id.). Petitioner objected to the PSR, asserting that he was not involved in the charged conspiracy and that he wished to withdraw his guilty plea. See (Id., Doc. No. 41; Doc. No. 42 at 17).

At the commencement of Petitioner's sentencing hearing, this Court affirmed the magistrate judge's acceptance of Petitioner's plea as knowingly and voluntarily made, noting that this Court had reviewed the Rule 11 transcript and felt "very confident" the magistrate judge properly informed Petitioner of his constitutional and trial rights and properly found his plea to be knowing and voluntary. (Id., Doc. No. 58 at 2-3: Sentencing Hrg. Tr.). This Court then heard arguments from counsel, after which this Court sentenced Petitioner to life in prison on the drug-trafficking charge; to 240 months, to be served concurrently, on the money-laundering charge; and to a consecutive 60 months in prison on the § 924(c) firearm charge. (Id. at 27). Petitioner appealed, arguing that this Court erred in denying his motion to set aside his guilty plea. The Fourth Circuit affirmed, holding that this Court properly weighed the Moore factors and did not abuse its discretion in denying Petitioner's motion to withdraw his plea. United States v. Andaya, 606 F. App'x 722, 722 (4th Cir. 2015). Petitioner now seeks to have his conviction vacated, arguing that trial counsel improperly failed to file a motion to suppress the evidence seized from 1440 Concord Farm Road. Petitioner argues specifically that his cousin, Bautista Andaya, was not competent to consent to the search of the home because his name was not on the lease and that Bautista Andaya did not know what he was consenting to. (Doc. No. 1 at 5). Petitioner speculates that Bautista was "possibly" coerced into signing the consent form and that

a suppression hearing "could have revealed this." (Id. at 6). Petitioner speculates further that had trial counsel filed a motion to suppress, "possibly" the evidence would have been suppressed and Petitioner would not have pleaded guilty. (Id. at 9). Petitioner also asserts that trial counsel provided deficient representation in failing "to actually translate the plea agreement document" into Spanish and that Petitioner "could not directly comprehend . . . the plea agreement in English" and "was not aware of the direct consequences of the plea." (Id. at 6-7). Petitioner asserts that, because of these errors by trial counsel, this Court should have granted his motion to withdraw his plea. (Id. at 7).

## II.    STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that Petitioner's arguments can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION

A. Petitioner's Motion to Appoint Counsel, Motion for Petitions, and Motion to Amend

Petitioner has filed a motion to appoint counsel, a document titled as a "motion for petitions," and a motion to amend. First, as to Petitioner's motion to appoint counsel, in § 2255 actions, appointment of counsel is governed by the Rules Governing § 2255 Proceedings, Rules 6(a) and 8(c), which mandate the appointment of counsel where discovery is necessary or if the matter proceeds to an evidentiary hearing. Id. Moreover, there is no constitutional right to the appointment of counsel in a § 2255 proceeding. Pennsylvania v. Finley, 481 U.S. 551, 555

(1987). The Court may appoint counsel to a financially eligible habeas petitioner if justice so requires. See 18 U.S.C. § 3006A(a)(2)(B). This Court finds that Petitioner has not shown that appointment of counsel is appropriate in this case. The Court, therefore, denies Petitioner's motion to appoint counsel.

Next, as to Petitioner's document titled a "Motion for Petitions," this document appears to be Petitioner's Reply to the Government's Response brief. To the extent that the Court has considered the arguments made in this document, Petitioner's "Motion for Petitions" is granted.

Finally, as to Petitioner's motion to amend, filed along with a second motion for appointment of counsel, Petitioner seeks appointment of counsel, as well as a stay until Petitioner can obtain access to a law library. The Court has already denied Petitioner's motion for appointment of counsel for the reasons stated herein. As for Petitioner's request for a stay in this action, the Court finds that Petitioner has not shown sufficient grounds for the Court to stay this action. Finally, as for Petitioner's motion to amend, the amendment of a § 2255 motion is governed by Rule 15 of the Federal Rules of Civil Procedure. See United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). Under Rule 15, "leave should be freely granted, and should be denied only where 'good reason exists . . . , such as prejudice to the defendants.'" Id. (quoting Walker v. United Parcel Serv., 240 F.3d 1268, 1278 (10th Cir. 2001)). Leave to amend should also be denied when the amendment would be futile. Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999). Here, in support of the motion to amend, Petitioner has not attached a proposed amended petition. Moreover, Petitioner argues only that "the previous petition is not structured and argued properly so in an amended petition Petitioner (with help from jailhouse lawyer), will file a petition that relates back to the original petition but more concise and arguing the law as it applies to the facts." (Doc. No. 13 at 4). Petitioner's motion to amend is denied.

Here, Petitioner essentially argues that he intends in his amended § 2255 petition, and with the help of a "jailhouse lawyer," to improve on the claims he has already brought in his petition. As the Court discusses below, Petitioner's claims are without merit; thus, any amendment would be futile. Therefore, the Court will deny Petitioner's motion to amend the § 2255 petition.

B.  Ineffective Assistance of Counsel Standard of Review

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

To establish prejudice in the context of a guilty plea, a petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007) (quoting

Hill v. Lockhart, 474 U.S. 52, 59 (1985)).  In evaluating such a claim, statements made by a defendant under oath at the plea hearing carry a "strong presumption of verity" and present a "formidable barrier" to subsequent collateral attacks.  Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).  Indeed, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should dismiss . . . any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." United States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005).

1. Counsel's failure to file a motion to suppress.

Petitioner first asserts that trial counsel improperly failed to file a motion to suppress the evidence seized from 1440 Concord Farm Road—a search that Petitioner acknowledges was conducted pursuant to the consent of his cousin, Bautista Andaya.  This claim fails because Petitioner has not shown a reasonable probability that a motion to suppress would have been granted.  First, Petitioner argues the possibility that a motion to suppress would have been granted, depending on the evidence that would have been presented during a hearing on the motion.   A theoretical possibility that the motion would have been granted, however, is not sufficient to establish the reasonable probability of a different result, required in order to satisfy the prejudice requirement under Strickland.

Second, during the evidentiary hearing conducted on Petitioner's motion to withdraw his plea, Petitioner acknowledged on cross-examination that Bautista Andaya was living at the residence when Bautista consented to the search and that Petitioner did not actually know what occurred during the encounter between law-enforcement officers and Bautista.  That Bautista Andaya was living at the home when he consented to the search establishes the legality of the search insofar as a co-tenant has the legal authority to consent to a search of the premises he

inhabits.  See United States v. Matlock, 415 U.S. 164, 171 (1974).  Petitioner has not suggested

that Bautista Andaya did not inhabit the areas he permitted the officers to search.  Petitioner's

argument "misconstrues the nature of the inquiry under the Fourth Amendment" to the extent "he

assumes that property rights conferred by State landlord and tenant law are exclusively

determinative of constitutional rights."  United States v. Haynie, 637 F.2d 227, 237 (4th Cir.

1980).

Third, the Government's evidence, presented in response to Petitioner's motion to

withdraw his guilty plea, also establishes the legality of the search Petitioner challenges here.

Officer Ramsey stated in his affidavit that Bautista Andaya was asked by a bilingual law-

enforcement officer whether he lived at 1440 Concord Farm Road, and Bautista Andaya

responded that he did.  (Crim. Case No. 3:12cr30-FDW, Doc. No. 35-1 at ¶ 8).  Bautista Andaya

informed the officer that he had lived there for about two months and that he lived there alone.

(Id.).  Petitioner has not presented any evidence refuting Bautista Andaya's representation to the

officers that he lived alone at the home when he consented to the search.  Petitioner has

therefore, failed to show that, even if counsel had filed a motion to suppress the evidence seized

from 1440 Concord Farm Road, there was a reasonable probability that this Court would have

granted the motion and Petitioner would not have pleaded guilty.

2. Counsel's failure to have the plea agreement translated into Spanish.

Petitioner also asserts that trial counsel improperly failed to hire an interpreter to translate

his plea agreement into Spanish.  The assertion that his guilty plea was either unknowing or

involuntary has already been considered by this Court, which found that Petitioner's guilty plea

was both knowing and voluntary, based in part on the fact that Petitioner had the benefit of an

interpreter during his Rule 11 colloquy and affirmed that he understood the nature of the offenses

to which he was pleading guilty, as well as the consequences he faced as a result of his guilty plea. The Fourth Circuit has affirmed this Court's finding that Petitioner's plea was both knowing and voluntary as supported by substantial evidence. Accordingly, Petitioner cannot show that even if his plea agreement had been translated in Spanish he would not have pleaded guilty or that counsel's failure to have the plea agreement directly translated resulted in Petitioner's misunderstanding of any of its material terms.

Finally, Petitioner's motion to vacate asserts many of the same arguments this Court considered and rejected while adjudicating Petitioner's motion to withdraw his guilty plea. The Fourth Circuit affirmed this Court's finding that Petitioner received the close assistance of counsel during the plea-bargaining process and that Petitioner knowingly and voluntarily pleaded guilty. Because Petitioner has not shown either deficient representation or prejudice sufficient to support a claim of constitutionally ineffective representation of counsel, Petitioner's motion to vacate is denied and the petition is dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2.      Petitioner's (1) Motion to Appoint Counsel, (Doc. No. 8), and Motion to Appoint Counsel, Motion to Amend/Correct Motion to Vacate, Set Aside, Correct Sentence, (Doc. No. 13), are **DENIED**. Petitioner's Motion for Petitions, (Doc. No. 12), is **GRANTED** to the extent that the Court has considered the arguments Petitioner has presented in the motion.

3. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Frank D. Whitney
Chief United States District Judge